UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 19-CR-10118-DPW |
| | ) | |
| **DERRICK SEMEDO** | ) | |

**DEFENDANT'S SENTENCING MEMORANDUM**

Approximately two years after Mr. Semedo last illegally imported a lizard from the Philippines, federal agents came to his home in New Hampshire, where he lives with his wife, two step-daughters, and infant twins, to question him about it. He admitted his wrongdoing to agents, just as he has admitted the crime charged in this Court, and is prepared to accept the consequences for his illegal actions. However, given the nature of the crime, Mr. Semedo's lack of criminal history, his family circumstances, and his service in the United States Army, as well as his early acceptance of responsibility, the parties agree that a sentence of incarceration is not warranted in this case. The defendant submits that a sentence of probation for a period of two years, four months home confinement, forfeiture of the lizard named Flash, and payment of a $100 special assessment, is a sentence sufficient but not greater than necessary to fulfill the needs of sentencing set forth in 18 U.S.C. §3553(a).[1]

I.      The Nature and Circumstances of the Offense

Mr. Semedo has admitted to illegally smuggling in yellow-headed water monitor lizards[2] from the Philippines in 2016. He admitted this conduct to agents when they came to his house in August

---

[1] The only difference in the sentencing recommendation of the parties is the government's request that Mr. Semedo be required to perform 180 hours of community service, the equivalent of four and half weeks of full-time work. Given Mr. Semedo's family's financial situation and the fact that he has twin one-year-old boys, the defendant asks this Court not to impose this requirement. Mr. Semedo has already served his country more than most, and there is little to be gained from community service that he has not already learned from this prosecution.

[2] The yellow-headed water monitor (*varanus cumingi*) is not an endangered specie, although it is listed in Appendix II of the Convention on International Trade in Endangered Species of Wild Fauna and Flora ("CITES"). Species listed in

1

2018, and agreed to plead guilty to the offense before the Court prior to any official charges being filed against him.

At the time Mr. Semedo committed the offense before the Court, he was newly married and his wife had recently suffered a miscarriage. He felt pressure to provide additional financial support for his new family, and made a very poor decision to engage in these acts, which not only made him virtually no money but also have now severely affected his life. He stopped buying these illegally imported lizards in December 2016.

Mr. Semedo was introduced to the idea of buying illegally imported yellow-headed water monitors from another individual, who Mr. Semedo described as his "business partner."[3] Together, they agreed to buy these lizards from the Philippines and have them shipped to Mr. Semedo's house. All of the five shipments received by Mr. Semedo were combined purchases between Mr. Semedo and his business partner. This person told Derrick Semedo that "good cumingi sell here for 2500." This same individual also told Mr. Semedo that two of the lizards they received in one shipment would likely sell for $2000. However, while Mr. Semedo has agreed that the "fair market value" of one of these lizards is $2,500,[4] Mr. Semedo did not sell any of these lizards for $2,500.

Mr. Semedo bought these lizards for $450 each. Of the 22 lizards he imported, he himself sold less than five, for less than $1,000 each. While he did try to sell one lizard for $2,500 to an undercover agent, the adult male lizard named Flash, he later retracted his offer to sell Flash, saying

---

Appendix II are not currently threatened with extinction but trade of these species is regulated to protect them. As such, importation of the yellow-headed monitor requires a valid foreign export permit from the animal's country of origin. Any species imported under CITES must also be declared to the U.S. Customs Service and U.S. Fish and Wildlife Service. These regulations were not followed in this case, resulting in a violation of the Lacey Act, the offense charged in this court.

[3] As far as counsel is aware, this other individual has not been charged with any crime relating to his involvement in importing and selling these lizards. As noted by the government in their sentencing memorandum, the two people in the Philippines who sold the lizards to Mr. Semedo were prosecuted and received sentences of one year imprisonment and one month imprisonment. D.E. 14, pp. 5-6.

[4] When Mr. Semedo purchased the lizards, they were young lizards, which have a much lower fair market value than adult lizards. The fair market value agreed-to by the parties here is the fair market value of an adult lizard.

that he was going to keep him to breed him. Some of the lizards did not survive. The others he either kept for himself to try to breed, or sent to his "business partner" or to buyers who had purchased the lizards from his business partner. In fact, most of the lizards went to Mr. Semedo's business partner or people who purchased the lizards through his business partner. Thus, Mr. Semedo made very little money in this venture. Even the lizards he kept to breed, he was unable to breed. The one lizard he still had, Flash, has been seized by the government and will be forfeited.

II.     Mr. Semedo's Background and Characteristics

Mr. Semedo was born and raised in Boston. His family was poor, and he was essentially raised by his grandmother because his mother worked two jobs to support her six children. His father was absent from his life until Mr. Semedo was a teenager, at which time Mr. Semedo moved in with his father in Brighton. Despite these difficult circumstances, Mr. Semedo graduated from Brighton High School at 18 years old. Mr. Semedo's only brush with the law came during his senior year of high school, when he was arrested for disorderly conduct and resisting arrest, charges that were dismissed that summer. Mr. Semedo has no other criminal history.

The fall following his high school graduation, Mr. Semedo enlisted in the United States Army. He served for six years and was deployed to Afghanistan two times as part of Operation Enduring Freedom. He served as a communications specialist and received the following awards for his service:

- Afghanistan Campaign Medal with Campaign Star
- Army Commendation Medal
- National Defense Service Medal
- Global War on Terrorism Service Medal
- Army Service Ribbon
- Armed Forces Reserve Medal with M Device[5]
- NATO Medal

---

[5] The M Device indicates that the award was given in connection with mobilization.

As the government has acknowledged in their sentencing memorandum, Mr. Semedo's service to this country warrants a variance. "Our Nation has a long tradition of according leniency to veterans in recognition of their service, especially for those who fought on the front lines." *Porter v. McCollum*, 558 U.S. 30, 43 (2009); *see also United States v. Howe*, 543 F.3d 128, 139 (3rd Cir. 2008) (where defendant convicted of mail fraud with guidelines of 18-24 months, sentence of probation with three months home detention not unreasonable in part because of Howe's twenty years of military service followed by honorable discharge.).

In 2016, Mr. Semedo married his wife, who had two daughters from a prior relationship. They were only 6 and 7 years old at the time, but Mr. Semedo treated them like his own and has raised them as such since that time. He has been employed consistently as a commercial truck driver since returning from the military, but has since been fired as a result of his conviction in this case. Just two years ago, Mr. Semedo and his wife bought their current home in Nashua, New Hampshire. Last year, Mr. Semedo and his wife gave birth to twin boys. Since becoming unemployed, Mr. Semedo's primary job has been to care for the twins. He has also started his own pet business from his home, although he has yet to make any money from that business.

III.  The Guideline Sentencing Range

While the Guidelines are only one of a number of factors properly considered at sentencing under 18 U.S.C. §3553(a) and cannot be presumed to be reasonable, they are the starting point in determining any sentence. *See Gall v. United States*, 552 U.S. 38, 49 (2007). However, the Court "may not presume that the Guidelines range is reasonable" and must "make an individualized assessment based on the facts presented." *Id.* at 50. Indeed, "the Guidelines are only one of the factors to consider . . . and 3553(a) directs the judge to consider sentences other than imprisonment." *Id.* at 59. Thus, district courts are now permitted, indeed, directed to consider whether the advisory guidelines

would result in a sentence of imprisonment that is unreasonably high or ignore viable alternatives to incarceration. *See United States v. Kimbrough*, 552 U.S. 85, 109; *United States v. Boardman*, 528 F.3d 86 (1st Cir. 2008); *United States v. Martin*, 520 F.3d 87, 93-94 (1st Cir. 1998).

Mr. Semedo does not dispute that the Sentencing Guidelines here call for a sentence between 10 and 16 months. However, in this case, imprisonment would not serve the purposes of sentencing set forth in 18 USC § 3553(a), and the guidelines are not an accurate measure of the defendant's culpability. As described above, while the fair market value of the lizards is $55,000 (22 x $2,500), Mr. Semedo realized far less than that amount in profit. Nonetheless, his offense level is increased by 6 levels because of the fair market value, as well as being increased by an additional 2 levels because the offense was committed for pecuniary gain, despite the fact that there was little pecuniary gain for Mr. Semedo. Mr. Semedo actually made less than $3,000 from this offense, but his guidelines recommend a punishment synonymous with a much larger margin of profit. Under the circumstances, the proposed sentence of two years probation is much more in line with the offense conduct.

In addition, the Court should consider that the sentencing guidelines were amended last year to encourage judges to impose non-incarcerative sentences for first-time, non-violent offenders like Mr. Semedo. Application Note 4 to §5C1.1 now states: "If the defendant is a nonviolent first offender and the applicable guideline range is in Zone A or B of the Sentencing Table, the court should consider imposing a sentence other than a sentence of imprisonment, in accordance with subsection (b) or (c)(3). See 28 U.S.C. § 994(j)." While the guidelines in this case fall in Zone C, the parties agree that Mr. Semedo should essentially be given a one-level variance, which would place him in Zone B. This amendment was designed to reflect Congress's directive to the Sentencing Commission to ensure that the guidelines reflect "the general appropriateness" of non-incarcerative sentences for first-time, non-violent offenders. 28 U.S.C. § 994(j).

IV.     A Sentence That Comports with the Purposes of Sentencing

As in all sentencing proceedings, the Court's determination comes down to deciding what punishment is fair, necessary, and appropriate, given all of the relevant facts and circumstances; or, in the words of 18 U.S.C. § 3553(a), establishing what sentence is "sufficient but not greater than necessary." "Imposing a sentence on a fellow human being is a formidable responsibility," compelling "a court to consider, with great care and sensitivity, a large complex of facts and factors. The notion that this complicated analysis, and moral responsibility, can be reduced to the mechanical adding-up of a small set of numbers artificially assigned to a few arbitrarily-selected variables wars with common sense." *United States v. Gupta,* 904 F. Supp. 2d 349, 350 (S.D.N.Y. 2012). Put another way, the Court must conduct a "more holistic inquiry" than simply plugging numbers into a guidelines calculation, and "section 3553(a) is more than a laundry list of discrete sentencing factors; it is, rather, a tapestry of factors, through which runs the thread of an overarching principle." *United States v. Yonathan Rodriguez,* 527 F.3d 221, 228 (1st Cir. 2008) (citing *Kimbrough v. United States*, 128 S.Ct. 558, 570 (2007)). That overarching principle is to "impose a sentence sufficient but not greater than necessary." *Id.* In reaching a decision on what constitutes an appropriate sentence, the district court should "consider all the relevant factors" and "construct a sentence that is *minimally sufficient* to achieve the broad goals of sentencing." *Id.* (emphasis added). In this case, consideration of all facts and factors, including Mr. Semedo's prompt acceptance of responsibility, his military service, his lack of criminal record, and his family obligations, warrants a sentence of probation.

In addition to consideration of other §3553(a) factors, such as the nature and circumstances of the offense, Mr. Semedo's history and characteristics, the guideline sentencing range, all addressed above, the Court must fashion a sentence that satisfies the four needs a sentence must fulfill. Put simply, those needs are: punishment, deterrence, incapacitation, and rehabilitation. *See* 18 U.S.C.

§3553(a)(2). A sentence of probation, four months home confinement, forfeiture of Flash, and a $100 special assessment, fulfills those needs.

The first purpose of sentencing is to "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." The fact that Mr. Semedo has been prosecuted for a felony offense in federal court, and will live with that felony conviction, adequately reflects the seriousness of the offense and promotes respect for the law. Courts have recognized that the stigma of a felony conviction constitutes punishment in and of itself. *See United States v. Prosperi*, 686 F.3d 32, 48 (1st Cir. 2012) ("Sometimes [courts do not] fully recognize the anguish and the penalty and the burden that persons face when called to account, as these men are, for the wrong that they committed" ); *United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) ("the need for further deterrence and protection of the public is lessened because the conviction itself already visits substantial punishment of the defendant"); *United States v. Smith,* 683 F.2d 1236, 1240 (9th Cir. 1982) ("The stigma of a felony conviction is permanent and pervasive."); *see also* Wayne A. Logan, "Informal Collateral Consequences," 88 Washington Law Review 1103 (2013) ("Today, convict status serves as a perpetual badge of infamy, even serving to impugn reputation beyond the grave."). Mr. Semedo has already felt the real effects of his felony conviction. He lost his job as a commercial truck driver because of this conviction, and the income from that job that his family depended upon. He has been unable to find new work because of the conviction,[6] and is unsure if his family will be able to afford their mortgage in the future. He has had to surrender his firearms, and will be prohibited from ever possessing a firearm again because of this conviction. In

---

[6] Unlike Massachusetts, New Hampshire (where Mr. Semedo resides) has no law prohibiting potential employers from asking applicants if they have a criminal record. *Compare* M.G.L. c. 151B §4(9 ½) (making it unlawful "[f]or an employer to request on its initial written application form criminal offender record information") *with* N.H. Rev. Stat. Ann. §651:15(X)(f) (2018) ("In any application for employment … a person may be questioned about a previous criminal record only in terms such as 'Have you ever been arrested for or convicted of a crime that has not been annulled by a court?'").

addition. articles appeared in several local newspapers following his conviction, causing Mr. Semedo shame, embarrassment, and damage to his reputation. Life will be exceedingly more difficult for him in the future because of this felony conviction, as he has already discovered.

In addition, as the Supreme Court has noted, a sentence of probation does constitute punishment. *See Gall v. United States*, 552 U.S. 38, 44 (2007) (describing probation as a "substantial restriction on freedom"). Section 3553(a)(3) requires judges to consider the types of sentences available by statute including "sentences other than imprisonment." A period of home detention is even more restrictive of liberty and thus adds to the punishment in this particular case.

The second and third purposes of sentencing are "to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant." Given the way Mr. Semedo has lived his life thus far, this one encounter with the criminal justice system is an aberration. He served honorably in our military for six years. He has no prior convictions, and no scorable criminal history. Data collected by the Sentencing Commission in a recently published a recidivism study, demonstrates that offenders with zero criminal history points have a lower recidivism rate than offenders with even one criminal history point. Tracey Kyckelhahn & Trishia Cooper, U.S. Sentencing Comm'n, <u>The Past Predicts the Future: Criminal History and Recidivism of Federal Offenders</u> at 6–9 (2017). Statistics aside, the court can be assured that Mr. Semedo will not recidivate. This prosecution alone has been deterrent enough for him never even to think about committing any crimes in the future. Even with regard to general deterrence, the publicity from this case has sent a message to those in the community who might think of doing something similar that they will be prosecuted in federal court if they do.

The final goal of sentencing is "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." There is no therapeutic or rehabilitative value in a prison sentence. Such a sentence would only

cause great harm to Mr. Semedo's family and young children, both financially and emotionally. Whatever services Mr. Semedo requires can be provided through probation.

## CONCLUSION

This Court should "consider every convicted person as an individual and every case as a unique study in human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996). Consideration of Mr. Semedo's individual circumstances, and the wrongs he committed, warrant a sentence of probation in this particular case.

DERRICK SEMEDO,
Respectfully Submitted,
By Her Attorney,

*/s/ Jane Peachy*
Jane Peachy, BBO #661394
Federal Public Defender Office
51 Sleeper Street, 5th Floor
Boston, MA  02210
(617) 223-8061

## CERTIFICATE OF SERVICE

I, Jane Peachy, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on August 8, 2019.

*/s/ Jane Peachy*
Jane Peachy